

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 1:14-CR-300 |
| | ) | |
| v. | ) | <u>Count 1</u>: 21 U.S.C. §§ 846 & 841(a)(1) |
| | ) | (Conspiracy to Distribute and Dispense, |
| DERRON MCRAE SIMON, M.D., | ) | and to Possess with Intent to Distribute |
| (Counts 1-9) | ) | and Dispense, Controlled Substances) |
| DONALD ALVIN PETTIES, | ) | |
| a/k/a "Don Petties" | ) | <u>Counts 2-4</u>: 21 U.S.C. § 859 |
| a/k/a "Darryl Petties" | ) | (Distribution of a Controlled Substance |
| (Counts 1, 5, 9) | ) | to a Person Under Twenty-One) |
| EREIDA ARLETT ESCOBAR | ) | |
| (Counts 1, 5) | ) | <u>Counts 5-8</u>: 21 U.S.C. § 841(a)(1) |
| LINDA DAO | ) | (Possession with Intent to Distribute |
| (Counts 1, 6) | ) | a Controlled Substance) |
| MICHAEL HARRIS | ) | |
| a/k/a "Dirty Mike" | ) | <u>Count 9</u>: 18 U.S.C. § 1028A |
| a/k/a "Smelly Mike" | ) | (Aggravated Identity Fraud) |
| (Counts 1 and 7) | ) | |
| AARON KWON | ) | <u>Forfeiture</u>: 21 U.S.C. § 853 |
| a/k/a "A-Kwon" | ) | (Forfeiture of Drug Assets) |
| a/k/a "A.K." | ) | |
| (Counts 1 and 8) | ) | |
| | ) | |
| Defendants | ) | |

## INDICTMENT

### AUGUST 2014 TERM — at Alexandria, Virginia

THE GRAND JURY CHARGES THAT:

### Introduction

1.    Beginning around January 2013, defendant DERRON MCRAE SIMON, M.D. ("SIMON") opened a wellness practice, known as "WithinMe MD," for which he was the Chief Medical Director and the primary—and often the only—doctor.

2.    From around February 2013 until around March 2014, SIMON purported to expand his medical practice to include a pain management practice. Throughout this time period, SIMON wrote and sold hundreds of prescriptions for oxycodone and other controlled substances, the vast majority of which were not for a legitimate medical purpose and were beyond the bounds of medical practice. SIMON wrote and sold these prescriptions despite knowing that the individuals in whose names the prescriptions were written were abusing, misusing, distributing, and/or selling the drugs. SIMON had never met many of these purported patients, many of whom had never set foot in WithinMe MD or even knew what WithinMe MD was. SIMON conspired with DONALD ALVIN PETTIES ("PETTIES"), EREIDA ARLETT ESCOBAR ("ESCOBAR"), LINDA DAO ("DAO"), AARON KWON ("KWON"), MICHARL HARRIS ("HARRIS"), S.R., and others known and unknown to the grand jury to distribute well over 11,000 oxycodone pills throughout the Eastern District of Virginia, as well as throughout other parts of Virginia and other states.

## Background on Defendants and SIMON's Medical Practice

3.    Around January 2013, in Arlington, Virginia, within the Eastern District of Virginia, SIMON opened a wellness practice, known as WithinMe MD. WithinMe MD staff primarily provided medical and natural weight loss assistance, hormone therapy, and skin care services to WithinMe MD patients, through prescribing medications and other forms of medical treatment.

4.    Most WithinMe MD patients were women, approximately ages twenty-five to forty.

5.    From around January 2013 until around July 2014, SIMON acted as the Chief Medical Director of WithinMe MD, as well as the primary—and often only—medical doctor at this medical practice.

6.     From around January 2013 until around September 2013, ESCOBAR was a WithinMe MD employee, serving in such roles as a receptionist and a medical assistant.

7.     PETTIES is SIMON's cousin.

8.     ESCOBAR, an associate of S.R., introduced S.R. to SIMON around May 2013.

9.     KWON and HARRIS are associates of S.R.

10.    DAO is S.R.'s girlfriend.

<u>Background on SIMON's Medical License</u>

11.    Around 1996, SIMON received a medical degree from Wayne State University in Detroit, Michigan. Around 2002, SIMON completed his residency in Surgery at the University of Medicine and Dentistry of New Jersey in Newark, New Jersey. On or about January 15, 2002, SIMON received a license to practice medicine and surgery in Virginia.

12.    From around November 24, 2008 until around July 11, 2014, SIMON's medical license was restricted by the Virginia Board of Medicine ("BOM"), after having either been suspended outright or placed on probation.

13.    While SIMON's medical license was on probation, it was subject to numerous terms and conditions, including, but not limited to, restrictions on where he could practice medicine and a requirement that he practice only under the supervision of an approved physician.

14.    At no time during the life of WithinMe MD was SIMON permitted by the BOM to practice medicine at WithinMe MD, or to practice medicine without supervision.

15.    On or about July 11, 2014, the BOM summarily suspended SIMON's license.

## Distribution of Controlled Substances General Allegations and Terminology

16.     The Controlled Substances Act ("CSA") governs the manufacture, distribution, and dispensation of controlled substances in the United States.  The CSA and the Code of Federal Regulations ("CFR") contain definitions relevant to this Indictment.

17.     The term "controlled substance" means a drug or other substance, or immediate precursor, included in Schedules I, II, III, IV, or V, as designated by Title 21, United States Code, Section 802(c)(6), and the CFR.

18.     A prescription for a controlled substance violates the CSA and the relevant CFR(s) if it is issued outside the scope of medical practice or is not for a legitimate medical purpose in the usual course of a professional practice.

19.     The term "Schedule II" means the drug or other substance has a high potential for abuse, has a currently accepted medical use with severe restrictions, and abuse of the drug or other substances may lead to severe psychological or physical dependence.

20.     The term "Schedule III" means the drug or other substance has less of a potential for abuse than drugs or other substances in Schedules I or II, has a currently accepted medical use in treatment in the United States, and abuse of the drug may lead to moderate or low physical dependence or high psychological dependence.

21.     The term "Schedule IV" means the drug or other substance has a low potential for abuse relative to the drugs or other substances in Schedule III, a currently accepted medical use in treatment in the United States, and abuse of which may lead to limited physical dependence or psychological dependence relative to the drugs or other substances in Schedule III.

22. The term "Schedule V" means the drug or other substance has a lower potential for abuse relative to the drugs or other substances in Schedule IV, a currently accepted medical use in treatment in the United States, and consists primarily of drugs or other substances containing limited quantities of certain narcotic and stimulant drugs.

23. The term "dispense" means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance.

24. The term "distribute" means to deliver (other than by prescribing, administering, or dispensing) a controlled substance, including sharing, diverting, or selling tablets to others.

25. The term "practitioner" means a medical doctor, physician, or other individual who is licensed, registered, or otherwise permitted by the United States or the jurisdiction in which he or she practices to dispense controlled substances in the course of professional practice.

26. The term "dosage" is the amount, frequency, and number of tablets of controlled substances authorized by a practitioner, who has been issued a Drug Enforcement Administration ("DEA") registration number.

27. The DEA issues registration numbers to qualifying practitioners, who become authorized to dispense Schedules II, III, IV, and V controlled substances. To be issued and to maintain a DEA registration number, a physician or non-physician must be in compliance with all state laws regarding the practice of medicine and the prescribing of medication.

28. The Virginia Department of Health Professions ("DHP") is a regulatory agency for the Commonwealth of Virginia that licenses health professionals, enforces standards of practices, and provides information to health care practitioners and the public.

29.     "Oxycodone," which is also known as "Oxy," is an opioid pain medication and a Schedule II controlled substance whose active ingredient is oxycodone. It is available in generic form and under brand names including "OxyContin," "Percocet," "Roxicodone," "Roxicet," and "Endocet."

30.     "Promethazine" is a prescription-only generic antipsychotic and antihistamine that comes in tablet or liquid form and is available in generic form and under brand names including Phenergan, Promethegan, and Romergan.

31.     "Codeine" is a Schedule II, III, IV, or V controlled substance, depending on its form and concentration. It is available in generic form and is often mixed with other substances, such as cough syrup, acetaminophen, aspirin, and promethazine. Codeine mixed with promethazine (also known as "lean") is a Schedule V controlled substance.

32.     Demand for oxycodone has grown to epidemic proportions in many parts of the United States, including Northern Virginia, where drug dealers can sell pills containing oxycodone for $1 per milligram or more.

33.     Oxycodone and other Schedule II controlled substances have a high potential for abuse and can be crushed and snorted or dissolved and injected to get an immediate high. This abuse can lead to addiction, overdose, and death.

**Count One**
**(Conspiracy to Distribute and Dispense, and to Possess with**
**Intent to Distribute and Dispense, Controlled Substances)**

THE GRAND JURY FURTHER CHARGES THAT:

34.     The allegations set forth in paragraphs 3-33 of this Indictment are incorporated herein by reference.

35.     From around February 2013 through around August 2014, in the Eastern District of Virginia and elsewhere, the defendants, DERRON MCRAE SIMON, M.D.; DONALD ALVIN PETTIES; EREIDA ARLETT ESCOBAR; LINDA DAO; MICHAEL HARRIS; and AARON KWON, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree together and with each other, and with others known and unknown to the Grand Jury, to knowingly, intentionally, and unlawfully distribute, and dispense, and possess with the intent to distribute and dispense, a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, not for a legitimate medical purpose and beyond the bounds of medical practice, in violation of Title 21, United States Code, Section 841(a)(1).

### Nature and Purpose of the Conspiracy

The purposes of the conspiracy included, but were not limited to, the following:

36.     To make as much money as possible through SIMON, PETTIES, ESCOBAR, DAO, HARRIS, KWON, and others known and unknown to the grand jury dispensing and distributing, and aiding and abetting the distribution and dispensation of, controlled substances, including, but not limited to, oxycodone, codeine, and promethazine, to each other and to other drug users and conspirators.

37.     To facilitate the re-distribution of controlled substances, including, but not limited to, oxycodone, to other drug users.

38.     To satisfy the demand for illegal distribution, sale, and consumption of controlled substances, including, but not limited to, oxycodone, within the Eastern District of Virginia and elsewhere, both inside and outside of Virginia.

## Ways, Manners, and Means of the Conspiracy

39.     In furtherance of this conspiracy and to effect and accomplish the objects of it, SIMON, PETTIES, ESCOBAR, DAO, HARRIS, KWON, and others known and unknown to the grand jury distributed, dispensed, and aided and abetted the distribution and dispensation of controlled substances, including, but not limited to, oxycodone.

40.     During the course and in furtherance of the conspiracy, SIMON wrote numerous fraudulent oxycodone 30 mg prescriptions in the names of PETTIES; ESCOBAR; DAO; HARRIS; KWON; friends, relatives, and associates of SIMON's and of these individuals; WithinMe MD employees; and fictitious individuals. These prescriptions were not written for a legitimate medical reason and were written beyond the bounds of medical practice.

41.     During the course and in furtherance of the conspiracy, SIMON and S.R. directed these individuals to fill fraudulent oxycodone 30 mg prescriptions written in these individuals' own names or in the names of others, and then to return the pills to SIMON or S.R. after obtaining them from the pharmacy.

42.     During the course and in furtherance of the conspiracy, SIMON concocted diagnoses for the purported patients, such as hip dysplasia, spinal stenosis, and radiculopathy, which he would consistently write on the fraudulent prescriptions.

43.     During the course and in furtherance of the conspiracy, SIMON directed ESCOBAR and another WithinMe MD employee, to confirm all calls from pharmacists who might call to verify oxycodone prescriptions.

44.     During the course and in furtherance of the conspiracy, SIMON would sign prescriptions en masse, sometimes full prescription pads at a time.

45.     During the course and in furtherance of the conspiracy, S.R., DAO, and others recruited individuals to fill fraudulent oxycodone prescriptions, targeting individuals with health insurance.

46.     During the course and in furtherance of the conspiracy, SIMON would meet with PETTIES, S.R., ESCOBAR and/or DAO in SIMON's private office at WithinMe MD with the door closed and locked, or in the WithinMe MD parking lot, approximately every week.

47.     During the course and in furtherance of the conspiracy, S.R. would bring lists of names and dates of birth to SIMON so that SIMON could write fraudulent prescriptions for oxycodone, and sometimes other controlled substances, in the names of these individuals, including DAO, HARRIS, and other friends, associates, and relatives of S.R. and DAO.

48.     During the course and in furtherance of the conspiracy, SIMON would give the fraudulent oxycodone prescriptions to PETTIES and S.R.

49.     During the course and in furtherance of the conspiracy, SIMON initially wrote fraudulent prescriptions for 120 oxycodone 30 mg tablets but SIMON and S.R. later decided to reduce the prescriptions to 60 oxycodone 30 mg tablets in order to be able to cycle the prescriptions with greater frequency (i.e., fraudulent prescriptions could be written in the same name more frequently) and to avoid growing suspicion from area pharmacists.

50.     During the course and in furtherance of the conspiracy, S.R. would pay SIMON and/or ESCOBAR approximately $500 to $1000 per fraudulent oxycodone 30 mg prescription, and at least some of the time SIMON and ESCOBAR evenly split the money.

51.     During the course and in furtherance of the conspiracy, SIMON initially "fronted" S.R. these fraudulent prescriptions, meaning that SIMON gave S.R. the fraudulent prescriptions

without requiring that S.R. pay upfront, and then S.R. later paid SIMON the money that S.R. owed SIMON.

52.     During the course and in furtherance of the conspiracy, SIMON directed ESCOBAR to create fraudulent patient history forms for the individuals whose names S.R. was bringing to SIMON, or to give these individuals the forms to complete themselves.

53.     During the course and in furtherance of the conspiracy, SIMON created, and directed the creation of, fraudulent medical records in WithinMe MD's electronic medical record system, Practice Fusion, in order to make it appear that these individuals were actually legitimate patients of WithinMe MD.

54.     During the course and in furtherance of the conspiracy, SIMON directed ESCOBAR to photocopy the prescriptions SIMON was writing in order to keep track of the dates on them so that SIMON would know when he could write each individual a new fraudulent prescription.

55.     During the course and in furtherance of the conspiracy, PETTIES, S.R., ESCOBAR, DAO, HARRIS, KWON, and others known and unknown to the grand jury, all went to various pharmacies, filled fraudulent prescriptions written by SIMON in their own names and/or the names of other individuals, and took possession of the oxycodone pills.

56.     During the course and in furtherance of the conspiracy, S.R. and DAO assisted numerous individuals in filling fraudulent prescriptions at various pharmacies.

57.     During the course and in furtherance of the conspiracy, S.R. and DAO told individuals who were filling fraudulent prescriptions that S.R. was part of a gang or drug cartel in order to intimidate these individuals.

58.     During the course and in furtherance of the conspiracy, S.R. directed DAO, HARRIS, KWON, and others known and unknown to the grand jury to return the oxycodone pills from their filled prescriptions to S.R.

59.     During the course and in furtherance of the conspiracy, in exchange for filling the prescriptions, S.R. would give these individuals cash, a small quantity of oxycodone 30 mg tablets, and/or a discount on present and future purchases of oxycodone tablets from S.R.

60.     During the course and in furtherance of the conspiracy, S.R. sold these tablets at a rate generally around $30-35 per oxycodone 30 mg tablet, with occasional discounts ranging from $15-25 per tablet, to HARRIS, KWON, and others known and unknown to the grand jury for further distribution.

61.     During the course and in furtherance of the conspiracy, SIMON and PETTIES wrote notes about the fraudulent prescriptions that SIMON was writing and PETTIES was filling in order to keep track of the information pertaining to each fraudulent prescription, such as the purported patient's name and address and the date written on the fraudulent prescription.

62.     During the course and in furtherance of the conspiracy, SIMON and PETTIES represented fraudulent addresses as the home addresses of the purported patients in whose names SIMON was writing the fraudulent prescriptions, including a vacant business address in a shopping center, 37 Pidgeon Hill Drive, Sterling, Virginia, 20165.

63.     During the course and in furtherance of the conspiracy, PETTIES used this fraudulent Pidgeon Hill address on his Virginia Identification Card, which he then used to fill some fraudulent prescriptions, in order to evade detection of law enforcement.

64.     During the course and in furtherance of the conspiracy, SIMON ordered bulk oxycodone pills from various retail and compounding pharmacies, which he then distributed to PETTIES, S.R., and others for further distribution

65.     During the course and in furtherance of the conspiracy, PETTIES and SIMON distributed the oxycodone pills that they obtained to a cousin of theirs ("the third cousin") and to others within the Eastern District of Virginia and elsewhere, both inside and outside of Virginia.

66.     During the course and in furtherance of the conspiracy, the third cousin made trips to Virginia on approximately a monthly basis where he would buy oxycodone pills from SIMON and/or PETTIES. The third cousin then returned to Michigan or Ohio in order to sell the pills.

67.     During the course and in furtherance of the conspiracy, SIMON, ESCOBAR, S.R., DAO, HARRIS, KWON, and others known and unknown to the grand jury distributed, or aided and abetted the distribution of, a mixture and substance containing a detectable amount of oxycodone, to multiple individuals under the age of twenty-one, including several who were the age of eighteen, in violation of Title 21, United States Code, Section 859.

68.     During the course and in furtherance of the conspiracy, SIMON, ESCOBAR, S.R., DAO, HARRIS, and others known and unknown to the grand jury knowingly, intentionally, and unlawfully distributed, or aided and abetted the distribution of, a mixture and substance containing a detectable amount of oxycodone within 1000 feet of a school or playground, in violation of Title 21 United States Code, Section 860(a), including Little Ambassadors' Academy, located in Arlington, Virginia, and Westlawn Elementary School, located in Falls Church, Virginia.

69.     During the course and in furtherance of the conspiracy, SIMON, PETTIES, ESCOBAR, S.R., DAO, and others known and unknown to the grand jury obtained substantial income and resources from their illegal distribution of controlled substances.

70.     During the course and in furtherance of the conspiracy, SIMON, PETTIES, ESCOBAR, S.R., and others known and unknown to the grand jury made fraudulent and misleading statements to conceal their oxycodone distribution and conduct to regulatory authorities and law enforcement, including, but not limited to, DHP, the Federal Bureau of Investigation ("FBI"), and pharmacists.

71.     During the course and in furtherance of the conspiracy, SIMON conspired with PETTIES, ESCOBAR, S.R., DAO, HARRIS, KWON, and others known and unknown to the grand jury to dispense, distribute, and possess with the intent to distribute well over 11,000 oxycodone pills.

## Overt Acts in Furtherance of the Conspiracy

        In furtherance of the conspiracy and to effect and accomplish the objects thereof, the defendants and their co-conspirators committed the following overt acts on or about the following dates in the Eastern District of Virginia and elsewhere, including, but not limited to, the following:

## Examples of Fraudulent Oxycodone Prescriptions

72.     On or about February 22, 2013, SIMON wrote a fraudulent prescription for 150 oxycodone 30 mg tablets in the name of PETTIES, not for a legitimate medical reason and beyond the bounds of medical practice.

73.    On or about February 22, 2013, PETTIES filled this fraudulent prescription written in his name at a CVS pharmacy located in Leesburg, Virginia, within the Eastern District of Virginia.

74.    On or about March 22, 2013, SIMON approached ESCOBAR and Cooperating Witness 1 ("CW-1"), another WithinMe MD employee, and asked if SIMON could write prescriptions in their names in order to fill prescriptions for SIMON's cousin.

75.    Around May 2013, SIMON told ESCOBAR that he was "making money" by selling fraudulent prescriptions for approximately $500 and that if she could recruit people to fill fraudulent prescriptions, then SIMON and ESCOBAR would split this money "50/50."

76.    Around May 2013, ESCOBAR introduced S.R. to SIMON in order for SIMON to sell prescriptions to S.R. written in the names of S.R. and associates of S.R.

77.    On or about May 31, 2013, SIMON directed ESCOBAR to give WithinMe MD's standard "patient intake form" to DAO, in order to create documentation purporting to support the fraudulent prescriptions that SIMON was writing in the name of DAO, which DAO subsequently completed.

78.    On or about May 31, 2013, SIMON wrote a fraudulent prescription for 120 oxycodone 30 mg tablets in the name of DAO, not for a legitimate medical reason and beyond the bounds of medical practice.

79.    On or about May 31, 2013, DAO filled this fraudulent prescription written in her name at a Giant pharmacy located in McLean, Virginia, within the Eastern District of Virginia.

80.    On or about July 15, 2013, SIMON wrote a fraudulent prescription for 60 oxycodone 30 mg tablets in the name of P.G., an individual under the age of twenty-one, not for a legitimate medical reason and beyond the bounds of medical practice.

81.    On or about July 19, 2013, after a CVS pharmacist called SIMON to verify the prescription that he had written for P.G., SIMON verified the validity, and legality, of the prescription.

82.    On or about July 29, 2013, ESCOBAR created a fraudulent medical record for ROMERO in Practice Fusion.

83.    On or about July 29, 2013, ESCOBAR created a fictitious electronic medical record for S.D. in Practice Fusion.

84.    On or about August 7, 2013, SIMON wrote a fraudulent prescription for 60 oxycodone 30 mg tablets in the name of ESCOBAR, not for a legitimate medical reason and beyond the bounds of medical practice.

85.    On or about August 7, 2013, after a Giant pharmacist called SIMON to verify the prescription that he had written for ESCOBAR, SIMON verified the validity, and legality, of the prescription.

86.    On or about August 7, 2013, ESCOBAR filled this fraudulent prescription written in her name at a Giant pharmacy located in Falls Church, Virginia, within the Eastern District of Virginia.

87.    On or about August 28, 2013, SIMON wrote a fraudulent prescription for 120 oxycodone 30 mg tablets in the name of S.D., not for a legitimate medical reason and beyond the bounds of medical practice.

88.    On or about August 28, 2013, PETTIES filled this fraudulent prescription written in the name of S.D. at a CVS pharmacy in Sterling, Virginia, within the Eastern District of Virginia.

89.     On or about August 28, 2013, after PETTIES was the subject of a traffic stop and was found to have a prescription bottle in the name of S.D. for 120 oxycodone 30 mg tablets, PETTIES told the Loudoun County sheriff who had stopped him several changing stories, including that S.D. was PETTIES's daughter and that S.D. was the daughter of PETTIES's fiancée.

90.     On or about October 14, 2013, SIMON created a fictitious electronic medical record for PETTIES in Practice Fusion.

91.     On or about October 17, 2013, SIMON wrote a fraudulent prescription for 60 oxycodone 30 mg tablets in the name of KWON, not for a legitimate medical reason and beyond the bounds of medical practice.

92.     On or about October 17, 2013, KWON filled this fraudulent prescription written in his name at Manassas Pharmacy, located in Manassas, Virginia, within the Eastern District of Virginia.

93.     On or about February 8, 2014, SIMON wrote a fraudulent prescription for 120 oxycodone 30 mg tablets in the name of S.P., PETTIES's daughter, not for a legitimate medical purpose and beyond the bounds of medical practice.

94.     On or about February 11, 2014, PETTIES attempted to fill this fraudulent prescription written in the name of S.P. at a Target pharmacy in Sterling, Virginia, within the Eastern District of Virginia.

95.     On or about February 17, 2014, PETTIES again attempted to fill this same prescription written in the name of S.P. at a Rite Aid pharmacy in Sterling, Virginia, within the Eastern District of Virginia.

96.    On or about March 20, 2014, SIMON purposefully, and with the intent to evade detection by law enforcement, made numerous fraudulent and misleading statements to the FBI, including but not limited to, the following:

      a.  "I certainly don't want people out there not using [narcotics] appropriately."

      b.  He did not think he had heard the name "S.R." before.

      c.  S.R. was a patient in summer 2013, for approximately three to four months, until around November 2013, but SIMON had not seen S.R. since then.

      d.  ESCOBAR was not connected to S.R.

97.    On or about March 20, 2014, SIMON and PETTIES exchanged numerous phone calls in which they discussed the FBI investigation and began to coordinate their stories in case they were later questioned by the FBI.

98.    On or about March 26, 2014, after DHP issued a subpoena for WithinMe MD records, SIMON told a WithinMe MD employee to lie to DHP and say that the records were stolen, when in fact SIMON well knew that this was untruthful.

99.    Around late March 2014, S.R. and DAO left Northern Virginia and fled to California in order to evade law enforcement.

100.    On or about June 6, 2014, SIMON left a fraudulent and misleading voicemail for P.K. in which SIMON fraudulently accused C.S. of lying when C.S. had said that C.S. had not served as a supervising physician for SIMON when in fact SIMON well knew that C.S. had not served as SIMON's supervising physician in accordance with the restrictions placed on SIMON's license by the BOM.

101. On or about July 8, 2014, PETTIES sent a text message to CW-2 requesting that CW-2 retrieve PETTIES's laptop from his bedroom, in order to prevent the FBI from accessing it.

102. On or about August 7, 2014, PETTIES made numerous fraudulent statements to a representative of the United States Pretrial Services for the Eastern District of Michigan, well knowing that they were fraudulent, with the intent to mislead and to obstruct justice, including but not limited to, that PETTIES had resided in Lansing, Michigan, for the last four years.

### CW-3's Prescription

103. On or about June 11, 2013, SIMON wrote a fraudulent prescription in the name of CW-3 for 120 oxycodone 30 mg tablets, not for a legitimate medical purpose and beyond the bounds of medical practice.

104. On or about June 11, 2013, S.R., DAO, and CW-3 were in S.R.'s Chrysler 300 when S.R. asked CW-3, in sum and substance, whether CW-3 wanted to "make some money."

105. On or about June 11, 2013, S.R. directed CW-3 to drive to WithinMe MD, where S.R. met with SIMON in the parking lot and picked up multiple fraudulent prescriptions, including one written in the name of CW-3.

106. On or about June 11, 2013, S.R. directed CW-3 to drive from WithinMe MD to a pharmacy and instructed CW-3 to give the fraudulent prescription to the pharmacy and then return the pills to S.R. after the pharmacist filled the prescription.

107. On or about June 11, 2013, W.B. drove CW-3 and ROMERO to a residence in Maryland where ROMERO sold the pills from CW-3 prescription to an individual in exchange for a large amount of money.

108. On or about June 11, 2013, S.R. then gave CW-3 approximately $200 in exchange for CW-3 having filled the prescription earlier that day.

109. On or about June 12, 2013, S.R. gave CW-3 a WithinMe MD patient intake form, directing CW-3 to fill out the form and then return it to S.R.

110. On or about June 12, 2013, S.R. directed CW-3 to date the form June 11, 2013, in order to comport with the date of the fraudulent oxycodone prescription written in CW-3's name and thus with CW-3's supposed "doctor's visit."

111. On or about June 13, 2013, S.R. retrieved this form from CW-3 and returned the completed form to SIMON.

112. On or about September 5, 2013, SIMON directed a WithinMe MD employee to create a fraudulent medical record for CW-3 and to upload the fictitious patient intake form that CW-3 had filled out in the electronic medical record system.

113. On or about July 25, 2013, S.R. texted CW-3 "K I was gonna say if I give u the paper u could go round to a few places to get the thingy cause im doing the same thing."

114. On or about July 30, 2013, SIMON wrote prescriptions for 60 oxycodone 30 mg tablets and for codeine in the name of CW-3, not for a legitimate medical purpose and beyond the bounds of medical practice.

115. On or about August 5, 2013, S.R. gave CW-3 the oxycodone and codeine prescriptions and directed CW-3 to fill the prescriptions and return the drugs to ROMERO.

116. On or about November 29, 2013, DAO sent CW-3 a message through Facebook, directing CW-3 to call DAO or S.R.

117.    On or about November 29, 2013, S.R. sent CW-3 a message through Facebook that said, in sum and substance, "? Some one told me ur snitching on people."

### CW-4 and HARRIS's Prescriptions

118.    On or about August 24, 2013, S.R. drove CW-4 and HARRIS to WithinMe MD, and CW-4 and S.R. met with SIMON in SIMON's private office.

119.    On or about August 24, 2013, SIMON wrote two fraudulent prescriptions for 60 oxycodone 30 mg tablets in the names of CW-4 and HARRIS, not for a legitimate medical purpose and beyond the bounds of medical practice.

120.    On or about August 24, 2013, SIMON handed the prescription in CW-4's and HARRIS's names, along with a number of other prescriptions that SIMON had previously written, to S.R. in exchange for approximately $1000.

121.    On or about August 24, 2013, S.R. drove CW-4 and HARRIS to a CVS pharmacy in Vienna, Virginia, within the Eastern District of Virginia, to fill CW-4's prescription.

122.    Later that day, ROMERO drove CW-4 and HARRIS to a CVS pharmacy in Annandale, Virginia, within the Eastern District of Virginia, where HARRIS filled the prescription written in HARRIS's name.

123.    On or about August 24, 2013, S.R. drove CW-4 and HARRIS to HARRIS's house, where S.R. and HARRIS made several phone calls about selling the pills from the prescriptions that CW-4 and HARRIS had just filled, and approximately five individuals came to HARRIS's house, to whom S.R. and HARRIS sold oxycodone pills.

124.    On or about September 10, 2013, S.R. contacted CW-4 by phone to ask if CW-4 wanted to "do that thing" and telling CW-4 to send CW-4's full name and date of birth to S.R.

125.    On or about September 10, 2013, SIMON wrote a fraudulent prescription in the name of CW-4 for 60 oxycodone 30 mg pills, not for a legitimate medical purpose and beyond the bounds of medical practice.

126.    On or about September 10, 2013, S.R. drove CW-4 to a CVS pharmacy in Annandale, Virginia, within the Eastern District of Virginia, so that CW-4 could fill this fraudulent prescription written in CW-4's name, giving CW-4 $50 to pay for the prescription.

127.    On or about September 10, 2013, after CW-4 filled the prescription, S.R. let CW-4 keep the change and one pill but directed CW-4 to give to S.R. the remaining fifty-nine pills.

### Bulk Oxycodone Tablets.

128.    On or about March 1, 2013, while filling out a "Controlled Rx Account Application" for Southern Anesthesia + Surgical, Inc. ("SAS"), a contractor for PSS World Chemical, Inc., a subsidiary of McKesson Corporation, SIMON falsely stated that his medical license had never been suspended.

129.    On or about March 19, 2013, SIMON placed an order for five 100-count bottles of oxycodone 30 mg tablets from SAS, which were subsequently shipped to WithinMe MD.

130.    On or about May 13, 2013, SIMON placed an order for five 100-count bottles of oxycodone 30 mg tablets from SAS, which were subsequently shipped to WithinMe MD.

131.    Around May 2013, SIMON directed CW-1 to research medical supply companies in order to find out how SIMON could order bulk shipments of oxycodone.

132.    Around May 2013, SIMON purchased a pill press so that he and PETTIES could make their own oxycodone tablets in order to sell oxycodone without having to go through pharmacies.

133.    Around May 2013, SIMON repeatedly watched videos on YouTube in order to try to learn how to make homemade oxycodone tablets.

134.    Around August 2013, because SIMON wanted to get rid of extra oxycodone pills that were lying around the WithinMe MD office in plastic bags, SIMON told ESCOBAR to sell these extra pills to S.R.

135.    Around August 2013, ESCOBAR sold these pills to S.R. and pocketed the money.

136.    On or about September 13, 2013, SIMON placed an order for drug manufacturing equipment and materials from Medisca, Inc., for shipping to WithinMe MD, including the following:

      a.    A glass mortar and pestle.

      b.    An eight-inch stainless steel spatula with a wooden handle.

      c.    A tablet triturate mold with fifty cavities.

      d.    One kilogram of Methylcellulose USP, a white binding agent.

      e.    100 grams of F.D. & C Blue No. 1 powder, a colorant.

      f.    One kilogram of Lactose NF (Anhydrous), an off-white powder used as a filler.

137.    Around February 2014, SIMON sent money to an individual in Cameroon in order to purchase oxycodone from that individual.

          (In violation of Title 21, United States Code, Sections 846 and 841(a)(1).)

**Counts Two through Four**
**(Distribution of a Controlled Substance**
**to a Person under Twenty-One)**

THE GRAND JURY FURTHER CHARGES THAT:

138.   The allegations set forth in paragraphs 3 through 137 of this Indictment are incorporated herein by reference.

139.   On or about the following dates, within the Eastern District of Virginia, DERRON MCRAE SIMON, M.D., at least eighteen years of age, knowingly and intentionally distributed thirty milligrams or more of a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, not for a legitimate medical purpose and beyond the bounds of medical practice, to the following individuals, all under twenty-one years of age:

| Count | Date | Recipient |
|-------|------|-----------|
| 2 | June 10, 2013 | M.L. |
| 3 | August 24, 2013 | N.D. |
| 4 | September 3, 2013 | V.F. |

(In violation of Title 21, United States Code, Sections 841(a)(1), 859, and 2.)

**Counts Five through Eight**
**(Possession with Intent to Distribute a Controlled Substance)**

THE GRAND JURY FURTHER CHARGES THAT:

140.   The allegations set forth in paragraphs 3 through 137 of this Indictment are incorporated herein by reference.

141.   On or about the following dates, within the Eastern District of Virginia, the following defendants did unlawfully, knowingly, and intentionally possess with intent to distribute the specified quantities or more of a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, not for a legitimate medical purpose and beyond the bounds of medical practice:

| Count | Date | Defendants | Quantity (mg) |
|---|---|---|---|
| 5 | April 30, 2013 | DERRON MCRAE SIMON, M.D.; DONALD ALVIN PETTIES; and EREIDA ARLETT ESCOBAR | 3600 |
| 6 | May 31, 2013 | DERRON MCRAE SIMON, M.D. and LINDA DAO | 3600 |
| 7 | August 24, 2013 | DERRON MCRAE SIMON, M.D. and MICHAEL HARRIS | 1800 |
| 8 | October 17, 2013 | DERRON MCRAE SIMON, M.D. and AARON KWON | 1800 |

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

## Count Nine
### (Aggravated Identity Fraud)

THE GRAND JURY FURTHER CHARGES THAT:

142.    The allegations set forth in paragraphs 3 through 137 of this Indictment are incorporated herein by reference.

143.    On or about April 30, 2013, within the Eastern District of Virginia, DERRON MCRAE SIMON, M.D., and DONALD ALVIN PETTIES did knowingly use, without lawful authority, a means of identification of another person during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to wit 18 U.S.C. § 1035, knowing that the means of identification belonged to another actual person.

(In violation of Title 18, United States Code, Sections 1028A(a)(1) and 2.)

## Notice of Forfeiture

144. The defendants, DERRON MCRAE SIMON, M.D.; DONALD ALVIN PETTIES; EREIDA ARLETT ESCOBAR; LINDA DAO; MICHAEL HARRIS; and AARON KWON are hereby notified, pursuant to Federal Rule of Criminal Procedure 32.2, that if they are convicted of the drug violations pursuant to Title 21, United States Code, Sections 841(a)(1), 846, and/or 859 charged in Counts 1-8 of this Indictment, the defendants shall forfeit to the United States any property constituting, or derived from, any proceeds defendant obtained, directly or indirectly, as the result of such violation; and any of the defendant's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation. Such forfeitable property includes a sum of money equal to at least $735,000 in United States currency, representing the amount of proceeds obtained as a result of the offenses alleged in the Indictment, as well as the medical license for SIMON from the Commonwealth of Virginia.

(Pursuant to Title 21, United States Code, Section 853.)

145. Pursuant to Title 21, United States Code, Section 853(p), the defendants shall forfeit substitute property, up to the value of the amount described in paragraph 144 above, if, by any act or omission of the defendants, the property or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

(Pursuant to Title 21, United States Code, Section 853.)

Respectfully submitted,

Dana J. Boente
United States Attorney

A TRUE BILL

Pursuant ...          ... rnment Act,
the original of ...      ... has been filed
under seal ...   ... Clerk's Office.

Jason M. Scheff
Special Assistant United States Attorney
Allison Ickovic
Special Assistant United States Attorney (LT)

Foreperson

27