**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

**UNITED STATES OF AMERICA**

**v.**

**DERRON MCRAE SIMON**

Criminal No. 1:14-CR-00300-001

**MOTION FOR REDUCTION OF SENTENCE PURSUANT TO 18 U.S.C. §
3582(c) (COMPASSIONATE RELEASE)**

NOW COMES defendant Derron McRae Simon, through undersigned counsel, and moves for reduction of his sentence to time served with a term of home confinement as a condition of supervised release due to the uncontrolled spread of COVID-19 at FCI Butner Low, where he is serving the sentence imposed by this Court.  In support of this motion, the defendant shows the Court the following.

**INTRODUCTION**

The COVID-19 pandemic continues to wreak havoc across the globe, infecting more than 15.2 million people and killing more than 624,000.[1]  In the United States, nearly 4 million people have tested positive and over 143,000 have died thus far.[2]

---

[1] COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins, Johns Hopkins Univ. & Med. Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html (last visited July 23, 2020).
[2] *Id.*

The virus has made its way into federal prisons and has hit FCI Butner especially hard.  The situation at FCI Butner Low is dire—it has had one of the largest outbreaks of any BOP facility in the country for weeks and it has seen more deaths than any other BOP facility. At least 673 inmates and 16 staff members have contracted COVID-19, and 16 inmates and 1 staff member have died since May 19, 2020.[3]  The total inmate death count including the other Butner facilities is 25.[4]  Indeed, the June 3, 2020 edition of the Raleigh News & Observer contains an article with the headline, "Butner starts mass COVID testing after 6 inmates die in 8 days."[5]

The rapid spread of the virus at Butner cannot be overstated. On March 30th, FCI Butner had two reported cases among the inmate population of COVID-19 and one staff member.[6]  By April 1st, BOP reported there were "nine confirmed cases of the coronavirus" at Butner, a 300% increase in just two days.[7]  By June 9th, the infected population at Butner Low had skyrocketed to 617 inmates and 7 staff members (not including those listed as having recovered).[8]  As of July 21th, 327 inmates at Butner Low and one staff member are currently infected, with 330 inmates and 14 staff members listed as having recovered. Put another way, a

---

[3] COVID-19 Coronavirus: COVID-19 Cases, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited July 21, 2020).
[4] *Id.*
[5] Butner Starts Mass COVID Testing After 6 Inmates Die in 8 days, Raleigh News and Observer, (June 3, 2020), https://www.newsobserver.com/news/coronavirus/article243210251.html.
[6] Two More Cases of COVID-19 Reported at Butner Federal Prison in North Carolina, Raleigh News and Observer, April 1, 2020, https://www.newsobserver.com/news/coronavirus/article241692281.html.
[7] https://www.bop.gov/coronavirus/index.jsp.
[8] https://www.bop.gov/coronavirus/index.jsp.

majority of the 1,109 total inmates at Butner Low have been infected with the coronavirus.[9]

A number of factors make being incarcerated at Butner particularly dangerous, especially for people with pre-existing medical conditions.

> People housed at Butner—a complex that is well over capacity—are packed into crowded dormitories, small cells, and narrow hallways. They cannot physically distance themselves from others or self-quarantine. They cannot ensure that others are effectively quarantined if they are infected. Instead, they must sleep within a few feet of one another—often in small cubicles—use communal bath facilities, and line up close to one another several times a day for food and medicine.[10]

Mr. Simon has risk factors that make him uniquely vulnerable in the current environment, including age, asthma and obesity.[11] Although he has been fortunate to test positive and survive, so long as he remains at Butner Low he remains at substantial risk.

In light of this, Mr. Simon respectfully asks the Court to reduce his sentence to time served with a term of home confinement as a condition of supervised release. For a person with his risk factors, the coronavirus pandemic, which public health experts and policymakers recognize is especially dangerous in the confines of correctional institutions, is an extraordinary and compelling circumstance. The

---

[9] https://www.bop.gov/locations/institutions/buf/.
[10] *Charles Hallinan v. Thomas Scarantino*, Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2241 and Class Action Complaint for Injunctive and Declaratory Relief (EDNC), https://www.acluofnorthcarolina.org/sites/default/files/13117120781.pdf at 2.

[11] People Who Are at Higher Risk for Severe Illness. Centers for Disease Control and Prevention; https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

threat presented, combined with the totality of the circumstances, warrants a sentence reduction to time served.

## STATUTORY FRAMEWORK

The compassionate release statute grants sentencing courts authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i). The statute provides:

(1) in any case--

(A) **the court**, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, **may reduce the term of imprisonment** (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), **after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—**

(i)     **extraordinary and compelling reasons warrant such a reduction; . . .**

**\*\*\*\*\***

**and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission**.

18 U.S.C. § 3582(c)(1)(A). Thus, the statutory requirements for sentence reduction are that the court: (1) find extraordinary and compelling reasons for the reduction, (2) consider the relevant sentencing factors under 18 U.S.C. § 3553(a), and (3) ensure any reduction is consistent with applicable policy statements.

## BACKGROUND FACTS

On March 6, 2015, this Court sentenced Mr. Simon to a term of 180 months for his convictions for conspiring to distribute Oxycodone, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and distributing of a controlled substance to a person under twenty-one, in violation of 21 U.S.C. § 859. [ECF No. 227]. He was sentenced to 180 months for each count to run concurrently. Absent compassionate release, his projected release date is June 27, 2027.

Mr. Simon has no history of violence. Prior to this case, he had never been in trouble with the law, except for traffic offenses. [ECF No. 221]. He has done extremely well in prison, taking advantage of many prison programs. As set forth below, he has a strong release plan that addresses all of his needs and will set him up to succeed if released.

Mr. Simon submitted a request for compassionate release to the warden at FCI Butner, Tamara Lyn, on June 19, 2020.[12] The warden denied his request on July 10, 2020. Mr. Simon now seeks compassionate release from this Court.

---

[12] Undersigned counsel is unable to provide documentation of this request due to the lockdown at FCI Butner Low. If the lockdown is lifted and counsel is able to obtain documentation, counsel will supplement this filing.

## ARGUMENT

### A. The Court has the authority to consider Mr. Simon's motion.

Although the compassionate release statute previously permitted sentence reductions only upon motion of the Director of the BOP, Congress expanded the statute in the First Step Act of 2018. Pub. L. 115-391 § 603(b), 132 Stat. 5194, 5239 (Dec. 21, 2018). As amended, § 3582(c)(1)(A)(i) now permits courts to consider motions filed by the defendant so long as "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"

The reason for the expansion to include defense-filed motions was the "documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants." *United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020). Accordingly, "while the First Step Act did preserve the BOP's role relative to a sentence reduction in certain limited respects, it eliminated the BOP Director's role as the exclusive channel through which a sentence reduction could be considered by courts." *Id.*

In this case, the timing provision has been satisfied in two ways. First, Mr. Simon submitted a request for reduction in sentence to the warden of his facility and was denied, providing the basis for the Court to consider this motion. *See United States v. Mcfarlane*, 2020 WL 1866311 at *1 (D. Mass. April 14, 2020) ("Defendant Macfarlane has requested that the BOP file a motion to reduce his

sentence and the BOP has denied that request. The Court finds that defendant has therefore fully exhausted his administrative rights and his motion is properly before this Court."); *United States v. Haney*, --F. Supp. 3d--, 2020 WL 1821988 at *3 (S.D.N.Y. April 13, 2020) (to satisfy §3582(c)'s exhaustion requirement, a defendant must either exhaust administrative remedies with the BOP or "simply wait 30 days after serving his petition on the warden of his facility before filing a motion in court."). Courts have held that the 30-day "clock" begins ticking when an inmate submits a request to the warden or BOP staff under the "prisoner's mailbox rule." *United States v. Resnick*, 2020 WL 1651508, at *6 (S.D.N.Y. Apr. 2, 2020). Courts have recognized that an Inmate Request to Staff constitutes a sufficient request. See *United States v. Griggs*, 2020 Wl 2614867, at *5 (D.S.C. May 22, 2020); *United States v. Reid*, 2020 WL 2128855 (N.D. Cal. May 5, 2020); *United States v. Echevarria*, 2020 WL 2113604 (D. Conn. May 4, 2020).

Second, the Court may excuse the 30-day wait period on equitable grounds, and COVID-19 is one such ground. *See, e.g., Casey v. United States*, No. 4:18-CR-4, 2020 WL 2297184, at *2 (E.D. Va. May 6, 2020) ("The COVID-19 pandemic, which could result in catastrophic health consequences for petitioners vulnerable to infection, implicates all three exceptions justifying the waiver of the exhaustion requirement"); *United States v. Poulios*, No. 2:09-CR-109, 2020 WL 1922775, at *1 (E.D. Va. Apr. 21, 2020) (waiving exhaustion requirement because preserving it could subject the defendant to severe illness and death if he contracts COVID-19 due to his underlying health conditions); *Porter-Eley v. United States*,

No. 4:16-CR-89, 2020 WL 3803030, at *2 (E.D. Va. July 6, 2020) (waiving the exhaustion requirement "given the COVID-19 pandemic and the catastrophic health consequences it has for inmates with underlying health conditions"); *United States v. Bess*, 2020 WL 1940809 at *4-5 (W.D.N.Y., April 22, 2020) (noting "the Covid-19 pandemic presents extraordinary circumstances that are beyond [the defendant's] control. Were this Court not to excuse [the defendant's] failure to exhaust, the outcome easily could be fatal."); *United States v. Guzman Soto*, ___ F.3d ___, 2020 WL 1905323 at *1 (D. Mass. April 17, 2020) (Finding that "[d]efendant need not fully exhaust all administrative rights to appeal a failure of the Bureau of Prisons ("BOP") to bring a motion for compassionate release.").[13]

Because Mr. Simon has exhausted his administrative remedies, and because his claims require immediate judicial review, this case is properly before the Court.

---

[13] *See also United States v. McCarthy*, 2020 WL 1698732, at *4 (D. Conn. Apr. 8, 2020) (excusing exhaustion requirement "in light of the urgency of [the defendant's] request, the likelihood that he cannot exhaust his administrative appeals during his remaining 26 days of imprisonment, and the potential for serious health consequences"); *Colvin*, 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020) (excusing exhaustion requirement "[i]n light of the urgency of [the d]efendant's request, the likelihood that she cannot exhaust her administrative appeals during her remaining eleven days of imprisonment, and the potential for serious health consequences"); *United States v. Zukerman*, 2020 WL 1659880, at *3-4 (S.D.N.Y. Apr. 3, 2020) (excusing exhaustion requirement, notwithstanding the fact that the defendant's term of imprisonment would not end, at the earliest, until May 2022, in light of the defendant's "advanced age and compromised health, combined with the high risk of contracting COVID-19 at [FCI] Otisville," where at the time of the order, at least one inmate had tested positive for the disease); United *States v. Perez*, 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020) (excusing exhaustion requirement for sentence ending approximately three weeks after the defendant's request to the BOP because "even a few weeks' delay carries the risk of catastrophic health consequences for [the defendant]," such that requiring exhaustion "would result in undue prejudice and ... [be] both futile and inadequate.").

### B. Mr. Simon's vulnerability to COVID-19 is an extraordinary and compelling reason for an immediate sentence reduction to time served.

The compassionate release statute does not expressly define or limit what constitutes an "extraordinary and compelling" reason for a sentence reduction. Black's Law Dictionary, however, defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common," BLACK'S LAW DICTIONARY (10th ed. 2014). Its definition of "compelling need," is one "so great that irreparable harm or injustice would result if [the relief] is not [granted]." *Id.* The present global pandemic is a quintessential extraordinary circumstance beyond what most Americans have experienced in their lifetimes. The grave risk to Mr. Simon from continued incarceration at FCI Butner provides a compelling reason for his immediate release.

### 1. The Court has authority to find extraordinary and compelling reasons other than those expressly identified in the commentary to U.S.S.G. § 1B1.13.

In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." The policy statement issued in exercise of that authority, U.S.S.G. § 1B1.13, provides examples of "extraordinary and compelling reasons" only in the application notes. The examples generally fall into four categories based on a defendant's (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health in combination with the

amount of time served, or (4) compelling family circumstances. U.S.S.G. § 1B1.13 comment. n.1(A)-(C). The commentary also includes a fifth catch-all provision for "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined by the Director of the Bureau of Prisons. U.S.S.G. § 1B1.13, comment. n.1(D).

However, the policy statement was last amended in November 2018, before the First Step Act was passed, and it still requires a motion filed by the BOP. For that reason, "a growing number of district courts have concluded the Commission lacks" a policy statement applicable to the post-First Step Act statute. *United States v. Mondaca*, No. 89-CR-0655 DMS, 2020 WL 1029024 (S.D. Cal. Mar. 3, 2020); *see also United States v. Brown*, 411 F. Supp. 3d 446, 449 (S.D. Iowa 2019) (citing cases). In *United States v. Cantu*, the Court explained:

> Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of sentence-modification provisions under § 3582.

No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019). Similarly, in *Redd*, the court noted that § 1B1.13 "by its terms applies only to motions for compassionate release filed by the BOP Director, not motions filed by defendants." 2020 WL 1248493, at *6 (E.D. Va. Mar. 16, 2020). Therefore, the court concluded, "there does not currently exist, for the purposes of satisfying the First Step Act's 'consistency' requirement, an 'applicable policy statement.'" *Id.*

Even where courts have not deemed § 1B1.13 entirely inapplicable due to the lack of amendment, they have held that judges have authority based on the

catch-all provision in Application Note 1(D) to find extraordinary and compelling reasons other than those listed. *See, e.g.*, *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086, *3 (D. Me. July 11, 2019) (stating that the existing policy statement provides "helpful guidance," but "is not ultimately conclusive given the statutory change"). In *Redd*, the court explained that "Application Note 1(D)'s prefatory language, which requires a determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance." 2020 WL 1248493, at *7 (citing cases); *see also United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020) ("[A] majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it." (internal quotation marks omitted)).

Accordingly, this Court has the authority to consider whether the worsening global pandemic, combined with the other relevant circumstances in this case, present an extraordinary and compelling basis for a sentence reduction, regardless of whether it falls within one of the existing categories in the § 1B1.13 commentary.

### 2. *COVID-19 is an unprecedented and rapidly-expanding global health emergency.*

Almost three months ago, on March 11, 2020, the World Health Organization officially classified the strain of coronavirus which causes COVID-19 as a

pandemic.[14] "COVID-19 is a serious disease" that makes certain populations of people severely ill and can lead to death.[15] The current best estimate is that the fatality rate among all demographics "is 5-35 times the fatality associated with influenza infection."[16] African Americans have much higher rates of hospitalization or death from COVID-19 than white people.[17]

On March 26, 2020, the United States became the global leader in COVID-19 infections.[18] That remains the case today.[19] Experts predict that the pandemic is not likely to end any time soon and a second wave will come in the fall.[20]

### 3. COVID-19 is particularly deadly in a prison setting.

Conditions of imprisonment create the ideal environment for the transmission of contagious diseases.[21] "Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19

---

[14] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), https://bit.ly/2W8dwpS.
[15] Declaration of Chris Beyrer, MD, MPH, Professor of Epidemiology, Johns Hopkins Bloomberg School of Public Health, ¶ 5 (Mar. 16, 2020) (Exhibit D)).
[16] *Id.*
[17] *COVID-19 in racial and ethnic minority groups*, Center for Disease Control (June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/racial-ethnic-minorities.html.

[18] Tom Porter, *The US is Well on the Way to Having a Coronavirus Outbreak Worse than China's or Even Italy's*, Business Insider (Mar. 26, 2020), *available at* https://www.businessinsider.com/figures-show-us-soon-coronavirus-worse-china- 2020-3.
[19] World Health Organization, Coronavirus disease (COVID-19): Situation Report – 112 (May 11, 2020), *available at* https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200511-covid-19-sitrep-..
[20] Len Strazewski, "Havard Epidemiologist: Beware COVID-19's second wave this fall," American Medical Association (May 8, 2020); https://www.ama-assn.org/delivering-care/public-health/harvard-epidemiologist-beware-covid-19-s-second-wave-fall.

[21] Joseph A. Bick, *Infection Control in Jails and Prisons*, 45
Clinical Infectious Diseases, 1047-1055 (Oct. 2007), https://doi.org/10.1086/521910.

to spread once introduced."[22]   The CDC recognizes the difficulty of preventing the introduction of COVID-19 into prison facilities:

> There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.[23]

Crowding, inadequate ventilation, and security issues all contribute to the spread of infectious disease in jails and prisons.[24] Hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission rates, is contraband in jails and prisons because of its alcohol content.[25]  Medical care of prisoners is limited in the best of times.[26]

---

[22] Centers for Disease Control and Prevention (CDC), Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019- ncov/community/correction-detention/guidance-correctional-detention.html.

[23] *Id.*

[24] Michael Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about- becoming-coronavirus-incubators.

[25] Keri Blakinger & Beth Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is a Contraband?*, ABA JOURNAL (Mar. 13, 2020), https://www.abajournal.com/news/article/when-purell-is-contraband-how-can- prisons-contain-coronavirus.

[26] *See* U.S. Dep't of Justice Office of the Inspector General, Review of the Federal Bureau of Prisons' Medical Staffing Challenges (Mar. 2016), https://oig.justice.gov/reports/ 2016/e1602.pdf (finding that the BOP experienced chronic medical staff shortages and failed to take adequate measures to address them, leading to problems meeting the medical needs of prisoners, requiring the use of outside hospitals, and endangering the safety and security of institutions); U.S. Dep't of Justice Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (Rev. Feb. 2016), https://oig.justice.gov/reports/2015/e1505.pdf (finding that BOP facilities and services, including medical services, were inadequate to meet the needs of an aging prison population leading to delays in medical treatment for prisoners with acute and chronic heart and neurological conditions, who wait an average of 114 days to see medical specialists); David Patton, Statement from Federal Defenders of New York, Federal Defenders of New York (Mar. 8, 2020), https://federaldefendersny.org/about- us/news/statement-from-federal-defenders-of-new-york.html.

Especially concerning is the threat of spread from asymptomatic persons who contract the virus. These asymptomatic persons show no, or limited symptoms, yet they continue to spread the virus. See *United States v. Scparta*, __ F.Supp. 3d __, 2020 WL 1910481, at *3 (S.D.N.Y. April 20, 2020) (criticizing the "senselessness" of Butner's quarantine policy based on "two undisputed scientific facts: (1) individual who are asymptomatic are capable of spreading COVID-19, and (2) individuals infected with COVID-19 may not show any symptoms for days.").

> ### 4. *Butner has specific features that make it more dangerous than other prisons.*

In *United States v. Bess*, 2020 WL 1940809 at *8 (W.D.N.Y. April 22, 2020), the court found, "the conditions at Butner are exceptionally dangerous." The problems the CDC identified in prison settings are present to a unique degree at Butner.[27] On top of the regular issues in a prison setting that make it a tinderbox for COVID-19, Butner is overcapacity.[28] Butner Low is one in a collection of facilities designed to hold no more than 3,998 people and there are currently 4,438 people incarcerated there.[29] Social distancing is impossible. Butner Low contains eight open-style housing units, each holding about 140–160 men.[30] The housing

---

[27] *Charles Hallinan v. Thomas Scarantino*, Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2241 and Class Action Complaint for Injunctive and Declaratory Relief (EDNC), https://www.acluofnorthcarolina.org/sites/default/files/13117120781.pdf at 20; COVID-19 Coronavirus: COVID-19 Cases, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited July 20, 2020).

[28] *Id*. at 3.
[29] *Id*.; See PREA Audit Report, National PREA Resource Center, Bureau of Justice Assistance 1 (Apr. 2, 2017), https://www.bop.gov/locations/institutions/buh/PREA_butner.pdf.
[30] *Id*. at 28.

units are open rooms divided into cubicles ranging in size from about 9' x 7' to about 11' x 7', with walls about 5' to 6' high.[31] "Because of the cubicle arrangement, most people housed in Butner Low sleep within six feet of several other people. In other words, the hundreds of men in Butner Low—many of them elderly or medically vulnerable—spend several hours every night within the CDC's suggested minimum physical distancing zone."[32] In finding that the conditions at Butner were "exceptionally dangerous" the Court in *Bess* cited the cramped living quarters. Inmates at Butner Low are "housed in a 150-man dorm that is divided up by a 4-foot wall into 3-man cubicles." *Bess*, 2020 WL 1940809 at *8.

Cubicles are not the only shared spaces where inmates are close together. "People housed in Butner Low share a small number of toilets, showers, and sinks across the entire housing unit. The fixtures are all within three feet of each other, meaning, people 'are in very close contact in the bathrooms.'"[33] For meals, people line up in their housing units standing just a few feet apart for approximately ten minutes, and there are packed lines for phones and computers, which are stationed just a few feet apart and not cleaned in between uses.[34]

Given this backdrop, the protective measures BOP has taken are inadequate. "Although the facility had passed out masks to inmates, [some] inmates were only using them sporadically and also were inconsistent about washing their hands."

---

[31] *Id*. at 27.
[32] *Id*. at 29.
[33] *Charles Hallinan v. Thomas Scarantino*, Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2241 and Class Action Complaint for Injunctive and Declaratory Relief (EDNC), https://www.acluofnorthcarolina.org/sites/default/files/13117120781.pdf at 32.
[34] *Id*. at 30-31.

*Bess*, 2020 WL 1940809 at *8. Additionally, some of the cloth masks provided do not fit and some are made of thin, translucent material.[35] "People housed at Butner Low are responsible for cleaning their own masks, but at points during the lockdown, laundry access has been limited. If masks are damaged or lost, there is no means to repair or replace them. [Inmates] are not given gloves."[36] What's more, BOP is inconsistent about enforcing the requirement to wear masks.[37] Not all staff members wear masks.[38] Some incarcerated people also do not wear their masks.[39] Many inmates also have regular contact with inmates from other housing units due to work.[40]

Butner Low also houses a large number of medically vulnerable inmates, many of whom, like Mr. Simon, are at high risk for severe illness from COVID-19:

> A primary function of Butner Low is to house individuals designated as Care Level 3. These are men "who have complex, and usually chronic, medical or mental health conditions and who require frequent clinical contacts to maintain control or stability of their condition, or to prevent hospitalization or complications, . . . [such as] [c]ancer in partial remission, advanced HIV disease, severe mental illness in remission on medication, severe congestive heart failure, and end-stage liver disease."[41]

The situation at FCI Butner is so bad, that a model inmate with a pre-existing condition fled the facility and spoke to the media about the conditions

---

[35] *Id.* at 32.
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.* at 33.
[41] *Id.* at 28.

inside.[42]  He described how watching the numbers of positive cases rise without being able to adequately protect himself caused fear to take over, leading him to make the decision to flee, a decision he perceived as necessary to save his life. *Id*. He described the shortages of cleaning materials like soap and explained that social distancing was impossible at Butner.  He turned himself in three weeks later, hoping additional protections would be put in place. *Id*.

Most recently, North Carolina Congressman David Price has called for more inmates from Butner and other hard hit facilities to be granted compassionate release.[43] He recently amended a spending bill in Congress to "include a provision addressing what he sees as a lack of effort to reduce the risk of the virus' spread through prisons by releasing medically vulnerable inmates." Speaking of Butner, Congressman Price said in an interview, "We expect accountability, and we also expect a full implementation of early release, compassionate release." "We expect full implementation of that in a facility that most obviously needs it and warrants it."

Further, the Marshall Project recently aired a story Congressman Price called "chilling" where two medically vulnerable inmates were released but did

---

[42] Dan Kane, Escapee from NC federal prison turns himself in after three weeks on the run. The News & Observer (April 21, 2020). https://www.newsobserver.com/news/local/article242170326.html

[43] Dan Kane, *Prison in NC needs to release more inmates to combat COVID-19, congressman says*, The News & Observer (July 16, 2020), https://www.newsobserver.com/news/coronavirus/article244255072.html.

not escape the virus.[44] Butner did not test them prior to release and "they carried it with them onto the planes. Within days, one was dead." He was so sick during the trip home, that airline officials put him in an ambulance instead of on the final leg of the flight.[45]

This story shines a spotlight on the devastating outbreak at Butner and the mismanagement of BOP's response to the virus.

> Their stories highlight systemic problems in the Bureau of Prison's botched response to the coronavirus pandemic. About 7,000 prisoners in the care of the U.S. government have contracted COVID-19; 94 have died. More than 700 infected correctional officers have carried the virus back and forth between their communities and their workplaces.
>
> Nowhere in the federal system has the outbreak been as deadly as the giant Butner complex about 15 miles northeast of Durham. Twenty-five prisoners there perished from COVID-19, the most of any federal lockup. Butner is also the only BOP prison to have a confirmed staff death.
>
> Butner is emblematic in other ways. Prison officials were slow to test for the disease, enabling infected men to spread the virus to their neighbors in cramped dorms where social distancing is impossible. In sworn affidavits, prisoners reported they went untested for six weeks or more even as their dorm mates fell ill, were taken to hospital and died. Officials moved infected men among the complex's five units.[46]

When widespread testing was done, the percentage of those who tested

---

[44] *Id*.; Joseph Neff and Dan Kane, *Freed from prison, dead from COVID-19, not even counted*, The Marshall Project (July 10, 2020), https://www.themarshallproject.org/2020/07/10/freed-from-prison-dead-from-covid-19-not-even-counted.

[45] *Id*.

[46] Joseph Neff and Dan Kane, *Freed from prison, dead from COVID-19, not even counted*, The Marshall Project (July 10, 2020).

positive at the minimum security camp in April was astonishingly high—87% of the 248 men held at the camp tested positive, and many showed no symptoms.[47] When the entire low security unit was tested, the number of positive cases reached 642, about 60% of the inmate population.[48]

Despite this terrible outbreak and an order from the U.S. Attorney General to release medically vulnerable prisoners who could serve their remaining sentence at home, Butner has lagged far behind other BOP facilities, releasing less than 1 percent of its inmate population to home confinement as compared to 2.5 percent, the average for BOP prisons.[49] As of July 10th, Butner's warden has only released 42 inmates whereas judges have released 57.

5. *Outbreaks across BOP Prisons and widespread calls for releasing medically vulnerable inmates*

In some cases, DOJ has taken the position that there is no need for compassionate release because BOP is well-equipped to contain COVID-19. The facts show otherwise. Although FCI Butner has one of the worst and the deadliest outbreak, COVID-19 is spreading within the BOP's walls nationwide. The confirmed BOP numbers as of July 22, 2020, are as follows:

- 4247 inmates with COVID-19 (5658 have recovered)

- 385 staff with COVID-19 (644 have recovered)

- 98 inmate deaths from COVID-19

---

[47] *Id.*
[48] *Id.*
[49] *Id.*

- 1 staff death from COVID-19

- 154 infected BOP facilities (both prisons & halfway houses)[50]

This chart[51] – current through July 22, 2020 – summarizes the spread of COVID-19 cases in BOP:



Based on this, the public health community is insistent on the critical need to rapidly reduce our prison populations, both for the health of our inmates and

---

[50] *See* https://www.bop.gov/coronavirus/ (last visited July 20, 2020).
[51] Available at www.levittandkaiser.com.

the health of the community as a whole:

> It is . . . an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible . . . Releasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole.

Exhibit A, ¶¶ 17, 19. As another physician sums it up, "We need to take the unprecedented step TODAY of providing urgent release to everyone in the jails who is at risk of serious morbidity and mortality from COVID."[52]

Members of Congress have likewise sounded the alarm regarding the need to do something for inmates in Mr. Simon's situation. On March 23, 2020, a bipartisan group of fourteen senators wrote to Attorney General Barr and the Director of the Bureau of Prisons to express "serious concern for the health and wellbeing" of those inmates "most vulnerable to infection."[53]  They noted that "[c]onditions of confinement do not afford individuals the opportunity to take proactive steps to protect themselves, and prisons often create the ideal environment for the transmission of contagious disease."  The senators called on the BOP to use existing tools like the elderly prisoner home confinement program and compassionate release to release vulnerable inmates from prison.[54]

Every day, more and more courts are recognizing the severe threat posed by COVID-19 – especially to inmates who present health-related risk factors for

---

[52] Jennifer Gonnerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients from the Coronavirus*, The New Yorker (Mar. 20, 2020) (quoting Rachael Bedard, Rikers Island Geriatrician).
[53] Exhibit E.
[54] *Id*.

contracting a deadly case of this disease, and especially in light of the fact that prisons are, as one court as put it, "tinderboxes for infectious disease." *United States v. Rodriguez*, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 1, 2020); *see, e.g.*, *United States v. Hernandez*, 1:18-cr-00834-PAE-4, 2020 WL 1684062 (S.D. N.Y. Apr. 2, 2020) (granting compassionate release to defendant who had asthma and no other risk factors); *United States v. Tran*, 8:08-cr-00197-DOC-1, 2020 WL 1820520 (C.D. Cal. Apr. 10, 2020) (same); *United States v. Harper*, 7:18-cr-00025-EKD-JCH-1, 2020 WL 2046381, at *3 (W.D. Va. Apr. 28, 2020 (granting compassionate release to defendant housed at Butner Medium when the facility had 60 inmate infections and 9 staff infections, finding the defendant had a 'particularized susceptibility' to COVID-19 due to his asthma, COPD, emphysema, and heart condition as well as other factors); *United States v. Zukerman*, 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020) (granting compassionate release to defendant with "serious underlying medical conditions" such as "diabetes and obesity").

Just this week, a judge in the Central District of California ordered FCI Lompoc (which has a fraction of Butner Low's active cases) to identify inmates to release on home confinement to prevent COVID-19 from spreading further.[55] The judge ordered Lompoc's warden and the director of BOP to identify at-risk

---

[55] Dave Minsky, Lompoc prison ordered to begin release of inmates to home confinement due to COVID-19, Santa Maria Times (July 20, 2020), https://santamariatimes.com/news/local/crime-and-courts/lompoc-prison-ordered-to-begin-release-of-inmates-to-home-confinement-due-to-covid-19/article_1e82497d-57e6-56a6-8347-5922db3ad351.html (Order included in article).

inmates, including those over 50 and those of any age with underlying health conditions, and to provide the list of inmates eligible for home confinement by July 29th along with an explanation of each internal denial for compassionate release.[56]

### 6. Mr. Simon has underlying health conditions that make him medically vulnerable to COVID-19.

Mr. Simon is 51 years old and has multiple risk factors, including asthma and obesity; plus he has the sickle cell anemia trait and is African American, all of which put him at increased risk for serious illness and death from COVID-19.[57] Exhibit B. He also has a number of other health conditions including esophagitis, peptic ulcer, gastritis, and an abdominal hernia. Exhibit B. Age alone puts him at elevated risk. Data from Wuhan reflect that people who are over 50 years old are four times more likely to die than those aged 40-49.[58] Further, many courts have granted compassionate release for defendants with asthma.[59] The same is true for

---

[56] *Id.*

[57] People Who Are at Higher Risk for Severe Illness. Centers for Disease Control and Prevention; https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html.

[58] Robert Verity et al., Estimates of the severity of coronavirus disease 2019: a model-based analysis, The Lancet (Mar. 30, 2020), available at https://www.thelancet.com/action/showPdf?pii=S1473-3099%2820%2930243-7.

[59] *United States v. Hunt*, 2:18-cr-20037-DPH-DRG, 2020 WL 2395222 (E.D. Mich. May 12, 2020); *United States v. Simpson*, 3:11-cr-00832-SI-3, 2020 WL 2323055 (N.D. Cal. May 11, 2020); *United States v. Amarrah*, 5:17-cr-20464-JEL-EAS-1, 2020 WL 2220008 (E.D. Mich. May 7, 2020); *United States v. Echevarria*, 3:17-cr-00044-MPS-1, 2020 WL 2113604 (May 4, 2020); *United States v. Ardila*, 3:03-cr-00264-SRU-1, 2020 WL 2097736 (D. Conn. May 1, 2020); *United States v. Brown*, 4:05-cr-00227-RP-CFB-1, 2020 WL 2091802 (S.D. Iowa Apr. 29, 2020); *United States v. Bertrand*, 3:00-cr-00012-LC-1, 2020 WL 2179387 (N.D. Fla. Apr. 29, 2020); *United States v. Handy*, PJM 04- 0559, 2020 WL 2041666 (D. Md. Apr. 28, 2020); *United States v. Harper*, 7:18-cr-00025-EKD-JCH-1, 2020 WL 2046381 (W.D. Va. Apr. 28, 2020); *United States v. Williams*, 3:17-CR-121-(VAB); -1, 2020 WL 1974372 (D. Conn. Apr. 24, 2020); *United States v. Gorai*, 2:18-cr-00220-JCM-CWH-1, 2020 WL 1975372 (D. Nev. Apr. 24, 2020); *United States v. Park*, 1:16-cr-00473-RA-1, 2020 WL 1970603 (S.D. N.Y. Apr. 24, 2020); *United States v. Tillman*, 1:07-cr-00197-PLM-1, 2020 WL 1950835 (W.D. Mich. Apr. 23, 2020); United States v. Suarez, 1:18-cr-20175-MGC-1, Dkt. No. 180 (S.D. Fla. Apr. 20, 2020); *United States v. Gileno*, 3:19-cr-161-(VAB); -1, 2020 WL 1904666 (D. Conn. Apr. 17, 2020); *United*

defendants with obesity.[60] "Nationally, African-American deaths from COVID-19 are nearly two times greater than would be expected based on their share of the population. In four states, the rate is three or more times greater."[61] In short, COVID-19 is more likely to lead to serious complications, or worse, for Mr. Simon than it is for others.

      In other cases, the government has conceded that conditions identified by the CDC as putting people at higher risk for severe illness from COVID-19 and who are not expected to recover from that condition, present an extraordinary and compelling reason to be considered for compassionate release---even if that condition in ordinary times would not meet the terms of the policy statement. *See*

---

*States v. Samy*, 2:16-cr-20610-AJT-DRG-1, 2020 WL 1888842 (E.D. Mich. Apr. 16, 2020); *United States v. Wen*, 6:17-CR-06173 EAW, 2020 WL 1845104 (W.D. N.Y. Apr. 13, 2020); *United States v. Smith*, 1:12-cr-00133-JFK-1, 2020 WL 1849748 (S.D.N.Y. Apr. 13, 2020); *United States v. Ben-Yhwh*, CR 15-00830 LEK, 2020 WL 1874125 (D. Haw. Apr. 13, 2020); *United States v. Tran*, 8:08-cr-00197-DOC-1, 2020 WL 1820520 (C.D. Cal. Apr. 10, 2020); *United States v. Burrill*, 17-CR-00491-RS-2, 2e (N.D. Cal. Apr. 10, 2020); *United States v. McCarthy*, 3:17-cr-00230-JCH-1, 2020 WL 1698732 (D. Conn. Apr. 8, 2020); *United States v. Ghorbani*, 18-cr-255-PLF (D.D.C. Apr. 3, 2020); *United States v. Hernandez*, 1:18-cr-00834-PAE-4, 2020 WL 1684062 (S.D. N.Y. Apr. 2, 2020); *United States v. Powell*, No. 1:94-cr-316-ESH, 2020 WL 1698194 (D.D.C. Mar. 28, 2020).

[60] *United States v. Handy*, 3:10-cr-00128-RNC-8, 2020 WL 2487371 (D. Conn. May 14, 2020); *United States v. Barber*, 6:18-cr-00446-AA, 2020 WL 2404679 (D. Or. May 12, 2020); *United States v. Hunt*, 2:18-cr-20037-DPH-DRG, 2020 WL 2395222 (E.D. Mich. May 12, 2020); *United States v. Ullings*, 1:10-cr-00406-MLB-1, 2020 WL 2394096 (N.D. Ga. May 12, 2020); *United States v. Foreman*, 3:19-cr-00062-VAB-1, 2020 WL 2315908 (D. Conn. May 11, 2020); *United States v. Jenkins*, 99-cr-00439-JLK-1, 2020 WL 2466911 (D. Co. May 8, 2020); *United States v. Quintero*, 6:08-cr-06007-DGL-1, 2020 WL 2175171 (W.D. N.Y. May 6, 2020); *United States v. Howard*, 4:15-cr-00018-BR-2, 2020 WL 2200855 (E.D. N.C. May 6, 2020); *United States v. Lacy*, 3:15-cr-30038-SEM-TSH-1, 2020 WL 2093363 (C.D. Ill. May 1, 2020); *United States v. Ardila*, 3:03-cr-00264-SRU-1, 2020 WL 2097736 (D. Conn. May 1, 2020); *United States v. Delgado*, 3:18-cr-00017-VAB, 2020 WL 2464685 (D. Conn. Apr. 30, 2020); United States v. Dillard, 1:15-cr-170-SAB, Dkt. No. 71 (D. Idaho Apr. 27, 2020); *United States v. Joling*, 6:15-cr-00113-AA-1, 2020 WL 1903280 (D. Or. Apr. 17, 2020); *United States v. Trent*, 3:16-cr-00178-CRB-1, 2020 WL 1812242 (N.D. Cal. Apr. 9, 2020); *United States v. Zukerman*, 1:16-cr-00194-AT-1, 2020 WL 1659880 (S.D. N.Y. Apr. 3, 2020).

[61] Racial Data Dashboard, The COVID Tracking Project, https://covidtracking.com/race/dashboard.

U.S.S.G. § 1B1.13 cmt. n. 1(A)(ii)(I). Letter Amending Government's Response, *United States v. Wise*, 1:18-cr-00072-ELH, ECF 185 (D.Md. May 18, 2020). *See also United States v. Castaldi*, 09-cr-59 (N.D.IL) Government's Response to Defendant's Renewed Motion to Reduce Prison Term Pursuant to 18 U.S.C. § 3583(c)(1)(A)(i) at 3 (May 18, 2020).

### C. Mr. Simon remains at risk of serious illness or death due to COVID-19.

As a preliminary matter, many courts have ordered compassionate release for positive-testing inmates, including those who have recovered. *See*, *United States v. Kess*, No. ELH-14-0480, ECF No. 57 at 11-13 (D. Md. June 17, 2020) (granting compassionate release for a defendant who had "recovered" from COVID-19); *United States v. Williams*, No. PWG-19-0134, ECF No. 70 at 7 (D. Md. June 10, 2020) (granting compassionate release for a defendant who had recovered from COVID-19, finding "extraordinary and compelling reasons" existed for relief based on the defendant's continued vulnerability to COVID-19, citing the fact that the defendant had a BMI of 32.5 and "is considered obese" and the fact that "it is uncertain whether Mr. Williams can contract COVID-19 more than once, and the potential long-term effects of the illness are still undetermined"); *United States v. Sholler*, 2020 WL 2512416, at *4 (N.D. Cal. May 15, 2020) (releasing COVID-19-positive inmate, noting that "it remains unclear whether recovering from COVID-19 renders one immune from new infection" and disagreeing with the Government's position "that defendant would be at lower risk of reinfection at Terminal Island"); *United States v. Rachal*, 2020 WL 35454473 (D. Mass. June 30, 2020) (releasing defendant

housed at FCI Butner Low who had served 52 months of 101 month sentence who was 68 years old, has hypertension, and had tested positive for COVID-19); *United States v. Common*, 2020 WL 3412233, at *1 (C.D. Ill. June 22, 2020) (releasing defendant with hypertension and asthma who had tested positive for COVID-19, stating "the risk of reinfection is not merely theoretical" and citing study that found "full recovery may not happen for years, if at all"); *United States v. Brown*, 2:18-cr-360, Dkt. No. 35 (N.D. Ala. May 22, 2020) (releasing defendant with asthma who had tested positive, noting the asthma diagnosis affects the respiratory tract and can cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease); *United States v. McCall*, 2020 WL 2992197, at *5 (M.D. Ala. June 4, 2020) (releasing COVID-19-positive inmate, noting inmate Solarzano's death "in BOP's custody just days after it deemed him 'recovered,'" and criticizing BOP's failure to change its guidance to physicians regarding the continued danger to COVID-19 patients even after apparent recovery); *United States v. Cruz*, 2020 WL 3256390, at *2 (D. Ore. June 17, 2020) (releasing inmate who "had a mild case and has apparently recovered" based on lack of adequate medical care at Lompoc and judge's recommendation that he receive "maximum time in community corrections"); *United States v. Brown*, Case No. 2:18-cr-360, Dkt. No. 35 (N.D. Ala. May 22, 2020) (granting compassionate release where the defendant was COVID-19-positive, had asthma, and had only served one year into the 60-month sentence); *United States v. Arreola-Bretado*, Case No. 3:19-cr-3410, Dkt. No. 50 (S.D. Cal. May 15, 2020) (granting compassionate release to defendant who tested positive for COVID-19

after concluding she will receive superior medical care outside of the custody of the Otay Mesa detention facility); *United States v. Fischman*, 16-cr-00246-HSG-1, ECF No. 76 (N.D. Cal. May 1, 2020) (granting compassionate release from Terminal Island to COVID-19-positive defendant); *United States v. Huntley*, No. 13-cr-119-ABJ, ECF No. 263, at 8 n.9, 10 (D.D.C. May 5, 2020) (ordering compassionate release for defendant who tested positive for COVID-19 while motion was being litigated); *Yeury J.S. v. Decker*, Case No. 2:20-cv-5071-KM, ECF. No. 20 (D.N.J. May 11, 2020) (ordering release for COVID-19-positive immigration detainee).

Mr. Simon tested positive on June 2, 2020. He was re-tested recently, tested negative, and has been classified as "recovered". But that should give the Court little comfort in light of the fact that a BOP inmate died recently from COVID-19 after having been deemed recovered from the illness.[62]    That Mr. Simon has technically recovered does not lessen the gravity of the situation because: (1) there is no evidence that people who have recovered from COVID-19 will not be infected again; and (2) the long-term effects of COVID-19 infection are not yet well understood and may have other consequences for Mr. Simon's health.

Although Mr. Simon contracted the coronavirus and survived, he remains very much at risk. There is no evidence that people who have recovered from COVID-19 will not be infected again. Researchers observe that generally, immunity wanes quickly for coronaviruses.[63] According to the Centers for Disease Control, it

---

[62] Richard Winton, "Inmate labeled as 'recovered' from coronavirus dies at Terminal Island," LA Times (May 28, 2020).
[63] Antonio Regalado, What if immunity to covid-19 doesn't last?, MIT Tech. Rev. (Apr. 27, 2020).

is not yet known whether survivors of COVID-19 will emerge with immune protection.[64] The World Health Organization has stated unambiguously that there "is currently no evidence that people who have recovered from COVID-19 and have antibodies are protected from a second infection."[65] Other experts agree. "'There is no proof at this point that the development of an antibody response will be protective,' said David Walt, a professor of pathology at Harvard Medical School and Brigham and Women's Hospital in Boston. 'There is no evidence yet that people can't be re-infected with the virus.'"[66]

In fact, there is growing evidence that a person can get re-infected with COVID-19 and the infection may be worse the second time.[67] "The possibility of

---

[64] CDC, Clinical Questions about COVID-19: Questions and Answers (last updated June 4, 2020).
[65] "Immunity passports" in the context of COVID-19. World Health Organization. April 24, 2020. www.who.int/news-room/commentaries/detail/immunity-passportsin-the-context-of-covid-19.

[66] Kristen V. Brown, Coronavirus Survivors Hope for Immunity—The Reality is More Complicated, Bloomberg (Apr. 14, 2020)

[67] John Bacon, "Can you get infected with COVID-19 twice? Experts say possibility is 'certainly real'" USA Today (July 16, 2020), https://www.msn.com/en-us/Health/medical/can-you-get-infected-with-covid-19-twice-experts-say-possibility-is-certainly-real/ar-BB16OqVL?ocid=spartan-dhp-feeds; D. Clay Ackerly, "My patient caught COVID-19 twice. So long to herd immunity hopes? Vox (July 12, 2020), https://www.vox.com/2020/7/12/21321653/getting-covid-19-twice-reinfection-antibody-herd-immunity; Antonio Regalado, What if immunity to covid-19 doesn't last?, MIT Tech. Rev. (Apr. 27, 2020) / Marta Galanti & Jeffrey Shaman, Direct observation of repeated infections with endemic coronaviruses; Kristen V. Brown, Coronavirus Survivors Hope for Immunity—The Reality is More Complicated, Bloomberg (Apr. 14, 2020); Press Statement by Zhan Qingyuan, Director, Pneumonia Prevention and Treatment, China-Japan Friendship Hospital (Jan. 31, 2020); Holly Secon, People can get the coronavirus more than once, experts warn—recovering does not necessarily make you immune, Business Insider (Feb. 27, 2020) (reporting cases of reinfections among patients in Japan and China); Kyunghee Park, Coronavirus May 'Reactivate' in Cured Patients, Korean CDC Says, Bloomberg.com (Apr. 8, 2020) (reporting that the Korea Centers for Disease Control and Prevention had announced a formal investigation into over 50 patients retesting positive for COVID-19); Josh Smith, South Korea reports more recovered coronavirus patients testing positive again, Reuters (Apr. 13, 2020). ("South Korea reported on Monday that at least 116 people initially cleared of the new coronavirus had tested positive again…").

reinfection is certainly real…[a]nd one that I am seeing repeatedly on the front lines," Dr. Robert Glatter, an emergency physician at Lenox Hill Hospital in New York City said.[68]  Dr. Glatter reported, "he has cared for a 'number of patients' who suffer only mild initial infections, get better and actually test negative for the virus before experiencing a recurrence of symptoms. The intensity can be worse the second time, he says.[69]

Two patients in New Jersey also appear to have contracted COVID-19 a second time almost two months after fully recovering from their first infection.[70] Again, the second infection appears worse: "COVID-19 may also be much worse the second time around."[71] Additionally, thirteen of the USS Theodore Roosevelt sailors who had contracted the virus, survived, and recovered, have now tested positive a second time.[72] What's more, repeat infections in a short period are a feature of many viruses, including other coronaviruses. So if some Covid-19 patients are

[68] John Bacon, "Can you get infected with COVID-19 twice? Experts say possibility is 'certainly real'" USA Today (July 16, 2020), https://www.msn.com/en-us/Health/medical/can-you-get-infected-with-covid-19-twice-experts-say-possibility-is-certainly-real/ar-BB16OqVL?ocid=spartan-dhp-feeds
[69] Id.
[70] D. Clay Ackerly, "My patient caught COVID-19 twice. So long to herd immunity hopes? Vox (July 12, 2020), https://www.vox.com/2020/7/12/21321653/getting-covid-19-twice-reinfection-antibody-herd-immunity.

[71] Id.
[72] Sarah McCammon, 13 USS Roosevelt Sailors Test Positive for COVID-19, Again, N.P.R. (May 16, 2020) (reporting that 13 sailors who had apparently recovered from COVID-19 and received negative test results had tested positive for a second time), available https://www.npr.org/sections/coronavirus-live-updates/2020/05/16 /857379338/5-uss-roosevelt-sailors-test-positive-for-covid-19-again

getting re-infected after a second exposure, it would not be particularly unusual.[73]

Research also suggests that immunity levels vary widely with some people developing virtually no immunity after contracting the virus.[74] "Immunity after any infection can range from lifelong and complete to nearly nonexistent... Mild illness, in other words, might not always build up protection."[75] In many viral infections, "the magnitude of an antibody response correlates well with how big the infection was... we don't have any good data on whether antibodies produced during an infection are protective against a second infection."[76] The fact that the virus is rampant at Butner Low suggests that reinfection is a very real risk for Mr. Simon.

Even if Mr. Simon does not contract COVID-19 again, he may be dealing with the long-term effects of the virus for months and even years to come. The long-term effects of COVID-19 are not yet well-understood, but a Dutch study released earlier this month confirms that even patients with mild symptoms may end up struggling for months with lingering COVID-19 symptoms, including shortness of breath, extreme fatigue, intermittent fevers, cough, concentration issues, chest pressure, headaches, and heart palpitations.[77] Some studies have shown that COVID-19

---

[73] D. Clay Ackerly, "My patient caught COVID-19 twice. So long to herd immunity hopes? Vox (July 12, 2020), https://www.vox.com/2020/7/12/21321653/getting-covid-19-twice-reinfection-antibody-herd-immunity.

[74] Marc Lipsitch, Who Is Immune to the Coronavirus?, N.Y. Times (Apr. 13, 2020)

[75] *Id*.
[76] Katarina Zimmer, What Do Antibody Tests For SARS-CoV-2 Tell Us About Immunity? (Apr. 15, 2020)

[77] Joshua Cohen, Report Suggests Some 'Mildly Symptomatic' Covid-19 Patients Endure Long-Term Effects, Forbes (June 13, 2020).

patients may experience changes in lung tissue, even for asymptomatic patients, although it is still too early to know if this will result in permanent lung damage.[78] Small-scale studies conducted in Hong Kong and Wuhan, China, show that survivors of the virus grapple with poorer functioning in their lungs, heart, and liver—particularly problematic for Mr. Simon given his asthma and other health concerns.[79]

Just a few weeks ago, Mr. Simon experienced difficulty breathing and intermittent cold sensation to his fingers and toes. Exhibit B. He needed to use an inhaler to assist with his breathing many times a day, which he did not need prior to contracting the virus. Exhibit B.

FCI Butner Low is simply not a safe place for Mr. Simon to be as he navigates the unknown aftermath of COVID-19 and continues to risk reinfection. *Cf. United States v. Carter*, No. TSC-16-0156, ECF No. 48 (D.D.C. June 10, 2020) (granting compassionate release over the government's objection that the defendant had contracted COVID-19, was asymptomatic, and had recovered, citing "the uncertainty" that the defendant could contract COVID-19 again). Indeed, Mr. Simon continues to be housed at one of the worst COVID-19 hotspots in the Bureau of Prisons, with no ability to take necessary protective measures, including social distancing.

For these reasons, Mr. Simon's continued detention in a facility rife with the virus constitutes a continuing danger.

---

[78] Lois Parshley, The emerging long-term complications of Covid-19 explained, Vox (June 12, 2020).
[79] Lisa Du, Virus Survivors Could Suffer Severe Health Effects for Years, Bloomberg (May 12, 2020).

**D. Considering all § 3553(a) factors, including the COVID-19 pandemic, Mr. Simon has served a sufficient sentence for his crime.**

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Under all of the circumstances in this case, the Court should conclude that the time that Mr. Simon has already served is sufficient to satisfy the purposes of sentencing. Under *Pepper v. United States*, 562 U.S. 476, 490-93 (2011), the Court can, and indeed must, consider post-offense developments under § 3553(a).

Here, the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risk it presents in light of Mr. Simon's vulnerability. Although the circumstances of the offense lead to the sentence that this Court originally imposed, the sentencing purpose of just punishment does not warrant a sentence that includes continued exposure to a life-threatening illness. In fact, the Eighth Amendment's prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody. *Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also Wallis v. Baldwin*, 70 F.3d 1074 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to "contagious diseases caused by overcrowding conditions"). The § 3553(a) factors can be met in this case by a reduced sentence of time served with an order of home confinement as a condition of supervised release.

This Court can have confidence that Mr. Simon would not pose a danger to

the community if released. His crime involved no violence. He had no criminal record prior to this case and no history of violence. [ECF No. 221]. And he will never be able to practice medicine or prescribe medication again. Further, under its PATTERN system, BOP rates him as a minimal risk of recidivism.

Additionally, Mr. Simon's conduct while in prison speaks to the question of whether the purposes of punishment have been met. Under *Pepper*, the Court must consider "the most up-to-date picture" of the defendant's history and characteristics, which "sheds light on the likelihood that [the defendant] will engage in future criminal conduct." *Id*. at 492.

Mr. Simon has made the most of his time in prison, enrolling in 23 courses, even founding a program of his own, and maintaining a nearly spotless disciplinary record.[80] Exhibit D, Exhibit E. In addition to the many programs, ranging form Houses of Healing, to OSHA training, to academic courses, to cooking, Mr. Simon indicates has taken over twenty hours of drug education and has received over 200 hours of Cognitive Behavioral Therapy (CBT).

He genuinely values these programs and has given a great deal of thought to pursuing similar programs on the outside. Mr. Simon has developed the idea for Life Switch University (LiSU), which has a mission of making the streets safer, strengthening families, improving economic conditions, and reducing recidivism. He has a detailed plan for LiSU and hopes to turn his idea into a 501(c)(3) non-profit reentry program once he is released. He also plans to participate in small group

---

[80] The one infraction he received was nonviolent (possession of a cell phone) which was not found on his person and which he denied. Exhibit E.

counseling sessions.

If released, Mr. Simon intends to live with his wife, Pamela Simon, and their two adult children, Camryn and Cole (who are home from college due to COVID-19) in Midlothian, Virginia. Mr. Simon and his wife are separated, but she is willing to have him live with her and support him until he gets on his feet. Exhibit C. She has a five-bedroom house with plenty of room for Mr. Simon, and she has provided a detailed letter to the Court describing her neighborhood and outlining the support she will provide, which includes housing, food, transportation, clothing, and health insurance. She works in the pharmaceutical industry, and it is clear from her letter that she is very responsible and would ensure that Mr. Simon complies with all requirements of home confinement. Exhibit C. At her home, his risk of re-infection would be far less than remaining at Butner Low.

Mr. Simon's wife described him as "one of the smartest people I know." His intellect, high degree of education, and demonstrated motivation to succeed all suggest that he would be able to find steady employment and transition well back to society. As serious as it was, this offense was an aberration in an otherwise successful life and is not characteristic of the person his wife has known for the past twenty years. Exhibit C.

Mr. Simon's release would not present a risk of spreading infection to the community. His positive test was a month and a half ago, and he has since tested negative, so he should not be contagious anymore. Additionally, he can self-quarantine in the attic of his wife's house for fourteen days upon release.

Under these circumstances, keeping Mr. Simon in prison would result in his serving a sentence that is "greater than necessary" to promote the goals of federal sentencing, and a sentence of time served with additional conditions of home confinement is well-warranted under the 3553(a) factors.

Home confinement is not incarceration, but it is "a serious restriction of liberty" nevertheless. *Ilchuk v. Attorney General*, 434 F.3d 618, 623 (3d Cir. 2006). Such an option ensures that Mr. Simon can take measures to protect his health, while he continues to be punished for his crimes. Counsel urges the Court to consider that option here.

## CONCLUSION

For the foregoing reasons, Mr. Simon respectfully requests that the Court grant reduction in sentence to time served, followed by three years supervised release, home detention and any other conditions the Court deems appropriate.

Dated: July 23, 2020

Respectfully submitted,
DERRON MCRAE SIMON
By Counsel


/s/ Cary Citronberg
Cary Citronberg
*Counsel for defendant*
Zwerling/Citronberg P.L.L.C.
114 North Alfred Street
Alexandria, VA 22314
703-684-8000 (office)
703-684-9700 (fax)
cc@zwerling.com

## CERTIFICATE OF SERVICE

The undersigned hereby certify that this document filed through the ECF system on July 23, 2020 will be sent electronically to the registered participants.

/s/ Cary Citronberg